COURT OF APPEALS
DECISION
DATED AND FILED

December 17, 2019

Sheila T. Reiff
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    2018AP1741-CR

Cir. Ct. No.  2013CF1074

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

　PLAINTIFF-RESPONDENT,

V.

CHONG LENG LEE,

　DEFENDANT-APPELLANT.

　　　　　APPEAL from a judgment and an order of the circuit court for Outagamie County:  GREGORY B. GILL, JR., Judge.  *Affirmed*.

　　　　　Before Stark, P.J., Hruz and Seidl, JJ.

　　　　　**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

　　　　　¶1　　PER CURIAM.  Chong Lee appeals a judgment convicting him of first-degree intentional homicide by use of a dangerous weapon, possession of a

firearm by a felon, and two counts of felony intimidation of a witness, as a party to the crime.[1] He also appeals an order denying his motion for postconviction relief. Chong argues the circuit court should have dismissed the homicide charge because the State failed to disclose, and later intentionally destroyed, exculpatory evidence. He also argues he is entitled to a new trial because the absence of certain transcripts has denied him his right to a meaningful appeal. We reject Chong's arguments and affirm.

## BACKGROUND

¶2      At about 1:50 a.m. on December 8, 2013, police responded to a call regarding a possible gunshot at the Luna Lounge in Appleton. When officers arrived, they found the victim, Joshua Richards, on the floor near the bar's entrance. Richards had been fatally shot in the head.

¶3      A security guard from the Luna Lounge told police that "two Asian individuals" had left the scene after the shooting, and they "were wearing white vest and white hat [sic]." Video footage from nearby traffic cameras and a security camera inside the Luna Lounge showed three individuals—who were later identified as Joe Thor, Paul Lee, and Phong Lee—running out of the building just after the shooting.[2] The record indicates that Chong and Paul are brothers. The

---

[1] This case involves multiple individuals with the surname "Lee." Accordingly, for clarity, and following the parties' lead, we generally refer to these individuals by their first names. We do the same for other individuals in this case who share a surname.

[2] Chong's appellate brief takes certain liberties when setting forth the factual background of this case. For instance, Chong represents that Paul was "wearing a white vest" when he left the Luna Lounge. In support of that assertion, Chong provides two record citations. One of those citations is to a page of the trial transcript that has nothing to do with what any individuals were wearing on the night of the shooting. The other citation is to the trial testimony of Blaine Vander Wielen, one of officers who responded to the shooting. At the cited page of the trial transcript, Vander Wielen testified that Phong, not Paul, was wearing a "white or light colored vest."

(continued)

security camera footage also showed other individuals, including Chong, exiting the Luna Lounge shortly after the shooting.

¶4      On the evening of December 11, 2013, police interviewed three possible witnesses to the shooting:  Watou Lee, Mikey Thao, and Ryan Thao. None of those witnesses identified Chong as the shooter.  Ryan provided a description of the shooter's clothing and told police the shooter had come "from the bar into the foyer area with a couple other people[]."  Mikey and Watou also provided descriptions of the shooter.  All three men told police that they were "very concerned" about their safety and "did not want to be identified" or "get involved" in this case.

¶5      Police also interviewed Paul at his place of work on the evening of December 11.  They did not ask Paul about Chong during that interview because they had no information at that time suggesting that Chong was the shooter.  After about one and a half hours, Paul was taken into custody and transported to the Appleton police station.

¶6      In the meantime, other officers interviewed "several females" in Milwaukee who indicated that Chong had "made some statements to them admitting to doing the shooting."  Thor also told police that Chong had admitted being the shooter and disposing of the gun.  On December 12, police interviewed

---

Chong also asserts that after Thor, Paul, and Phong left the Luna Lounge, they "ran to a dumpster area and two of them discarded their clothing."  Again, Chong cites Vander Wielen's testimony in support of this assertion.  However, Vander Wielen actually testified that video footage showed Thor, Paul, and Phong going to a "dumpster area" and then showed "some movement" in that area.  Based on that movement, police inspected the dumpster area and found a baseball hat between the dumpsters and a white vest inside one of the dumpsters.  Contrary to what Chong suggests in his appellate brief, Vander Wielen did not testify that Thor, Paul, or Phong discarded their clothing in the dumpster area.

Paul two more times while he was in custody at the Appleton police station, and during the second of those interviews Paul told police that Chong was the shooter.

¶7 On December 16, a criminal complaint was filed charging Chong with one count of first-degree intentional homicide by use of a dangerous weapon and one count of possession of a firearm by a felon. An Information was filed in March 2014 adding four counts of felony intimidation of a witness, as a party to the crime.[3]

¶8 The State did not disclose to the defense that the police had interviewed Watou, Mikey, and Ryan in December 2013. The recordings of those interviews were retained for seven or eight months, and the police then destroyed them. An officer later testified that the recordings were destroyed because the witnesses had requested that the police not disclose their identities and because the police "knew through discovery the defense would be able to obtain [the recordings]."

¶9 Nonetheless, at some point the police inadvertently disclosed Watou's, Mikey's, and Ryan's identities to the defense. The police then reinterviewed Watou, Mikey, and Ryan in April 2015. Recordings and "reports" of the April 2015 interviews were provided to the defense. Based on that evidence, one of Chong's attorneys noted during a motion hearing in May 2015 that it was clear the police had interviewed Watou, Mikey, and Ryan before, and she requested "all reports, notes and recordings of the initial interviews of these

---

[3] The Information also included a charge of solicitation of perjury. That charge was later dismissed and is not relevant to the issues raised in this appeal.

three individuals." The defense then learned that the recordings of the December 2013 interviews had been destroyed.

¶10   In September 2015, Chong moved to dismiss the first-degree intentional homicide charge. He argued the police had violated his right to due process by failing to disclose—and by later destroying—the recordings of the December 2013 interviews of Watou, Mikey, and Ryan. As an alternative to dismissal, Chong asked the court to suppress "any in court identification of Chong" by Watou, Mikey, and Ryan and any testimony by those witnesses "that links Chong … to the homicide in this case." The circuit court concluded the police had violated Chong's right to due process by destroying potentially exculpatory evidence in bad faith. However, the court determined dismissal of the homicide charge was not an appropriate remedy for that violation. Instead, the court prohibited the State (but not Chong) from calling Watou, Mikey, or Ryan to testify at trial.

¶11   An eleven-day jury trial took place in February and March 2016. At trial, there was evidence that seven individuals had heard Chong confess his involvement in the shooting. In addition, an officer testified that Paul had told law enforcement Chong "was the shooter."

¶12   Before trial, the parties had litigated an issue involving the admissibility of Chong's statements to others that he would "beat this case." The circuit court ruled that those statements were inadmissible, as they were not relevant and would "only add confusion to the matters at hand." Nevertheless, during her trial testimony, one witness—Stephanie Thao—read a letter Chong had written to her following his arrest that included the statement, "I'm pretty sure I'll beat this case though." Chong's trial attorneys did not object to that testimony.

The jury asked to see the letter during its deliberations. There is no transcript of any discussion between the court and the parties regarding the jury's request. However, the record shows that the letter was provided to the jury.

¶13    The jury ultimately found Chong guilty of the homicide count, the firearm possession count, and two of the witness intimidation counts. Chong moved for postconviction relief, arguing, among other things, that his trial attorneys were ineffective by failing to object when Stephanie read the "beat this case" letter during her trial testimony.

¶14    At a ***Machner***[4] hearing, attorney Deborah Vishny, Chong's lead trial attorney, testified she had no recollection as to why the defense did not object when Stephanie read the letter at trial. In addition, while Vishny agreed that there likely were "discussions" between the circuit court and the parties about "issues that came up" after the jury began its deliberations, she had no specific memory of those discussions. During Vishny's testimony, the court similarly stated that it had no "independent recollection" of any discussion regarding the jury's request to see the letter.

¶15    Vishny's co-counsel, attorney Evan Weitz, also testified that he could not recall why the defense did not object when Stephanie read Chong's letter. Weitz explained that the parties spent "quite a bit of time in chambers going through" various pieces of evidence, and the circuit court made rulings in chambers as to what evidence was admissible. Weitz testified, "I don't have a specific recollection as to this letter and what the decisions were, but I do

---

[4] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

6

remember that we tried to carefully go through these before they were being presented to the witnesses as far as what was coming in and what was not coming in."

¶16    Weitz further testified that he remembered the jury had asked questions during its deliberations, and he believed the parties reconvened in the courtroom to discuss those questions. However, he could not recall whether he objected during those discussions to the court sending the "beat this case" letter to the jury.

¶17    Following the *Machner* hearing, Chong argued he had been denied his right to a meaningful appeal because there were no transcripts of the circuit court's discussions with the parties regarding the admissibility of the "beat this case" letter and the jury's request to review that letter during deliberations. Specifically, Chong argued that due to the lack of transcripts, he was "unable to show that counsel was deficient in failing to object because it is quite possible that counsel did object when this issue was address[ed] in chambers." In the alternative, Chong argued that "if counsel did object in chambers, and the Court nonetheless ruled the evidence admissible, [Chong] cannot show that the Court erroneously exercised [its] discretion because there is no record of the Court's reasoning."

¶18    The circuit court denied Chong's postconviction motion. The court rejected Chong's claim that any missing transcripts deprived him of his right to a meaningful appeal, concluding Chong had not demonstrated a "colorable need" for those transcripts. In any event, the court concluded Chong could not demonstrate that the transcripts' absence had caused him any prejudice.

¶19 Chong now appeals, arguing that: (1) the State violated his right to due process by failing to disclose the December 2013 interviews of Watou, Mikey, and Ryan; (2) the State violated his right to due process by intentionally destroying the recordings of those interviews; and (3) the missing transcripts deprived him of his right to a meaningful appeal.

## DISCUSSION

### I. Failure to disclose the December 2013 interviews

¶20 Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Since *Brady*, courts have held that "[t]he prosecutor has a duty to disclose this evidence although there has been no formal request by the accused." *State v. Harris*, 2004 WI 64, ¶12, 272 Wis. 2d 80, 680 N.W.2d 737.

¶21 To establish a *Brady* violation, a defendant must show that: (1) the State suppressed the evidence in question; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the determination of the defendant's guilt or punishment. *State v. Rockette*, 2006 WI App 103, ¶39, 294 Wis. 2d 611, 718 N.W.2d 269. When reviewing a *Brady* claim on appeal, we accept the circuit court's factual findings unless they are clearly erroneous, but we independently determine whether a due process violation has occurred. *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶22 In this case, the State concedes that the police suppressed the December 2013 interviews of Watou, Mikey, and Ryan. However, the State

8

argues Chong has failed to satisfy the second and third prongs of the ***Brady*** analysis because he has not shown that those interviews were either favorable to him or material to the determination of his guilt.[5] We agree with the State's analysis.

¶23 Evidence is considered favorable to the defendant when, if disclosed and used effectively, it could make the difference between conviction and acquittal. ***Harris***, 272 Wis. 2d 80, ¶12. Favorable evidence encompasses both exculpatory evidence and impeachment evidence. ***Id.*** Here, Chong argues the December 2013 interviews of Watou, Mikey, and Ryan were favorable to him because they were exculpatory—that is, because they tended to establish his innocence.[6] *See **id.***, ¶12 n.9.

¶24 Chong argues the December 2013 interviews were exculpatory because "all three witnesses identified the shooter and gave descriptions of the shooter's clothing, personal characteristics, and direction of travel," and "[n]one of [the] three witnesses identified Chong … as the shooter." He contends, "It is axiomatic that any evidence identifying someone other than Chong as the shooter would have been favorable" to the defense.

---

[5] Chong does not argue that the December 2013 interviews of Watou, Mikey, and Ryan were material to the determination of his punishment, as opposed to his guilt. *See **State v. Rockette***, 2006 WI App 103, ¶39, 294 Wis. 2d 611, 718 N.W.2d 269. Accordingly, we do not address that issue.

[6] In his reply brief, Chong asserts for the first time that the December 2013 interviews of Watou, Mikey, and Ryan could have been used to impeach any contrary testimony provided by those witnesses at trial. We need not address arguments raised for the first time in a reply brief. ***A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998).

¶25 Chong's argument in this regard is misleading. He does not cite any portion of the record supporting his assertion that Watou, Mikey, or Ryan identified a specific person other than Chong as the shooter during the December 2013 interviews. Instead, the record shows that Watou, Mikey, and Ryan merely provided general descriptions of the shooter's clothing, appearance, and direction of travel. Chong does not cite any evidence suggesting that those descriptions were inconsistent with his own clothing, appearance, or location on the night of the shooting. In other words, Chong has not developed an argument that the descriptions the witnesses provided eliminated—or even cast doubt on—the possibility that Chong was the shooter.

¶26 We also reject Chong's claim that the December 2013 interviews were exculpatory merely because none of the three witnesses specifically identified him as the shooter. It is undisputed that two of those witnesses—Watou and Ryan—did not know Chong in December 2013. Thus, those witnesses obviously could not have identified Chong as the shooter by name at the time of their initial interviews, and they were not presented with any photographs or an in-person lineup that would have allowed them to identify Chong by appearance. The third witness—Mikey—knew Chong but told police he thought Chong had been in jail on the night of the shooting. That statement was not exculpatory, however, because video evidence established that Chong was, in fact, at the Luna Lounge when the shooting occurred.

¶27 Chong also argues that the content of the December 2013 interviews must have been favorable to him because the police arrested Paul in connection with the shooting on the same date those interviews occurred. Chong reasons, "The logical conclusion from this is that these witnesses' statements supported the theory that Paul was the shooter. At a minimum, the statements … could not have

considerably undermined probable cause to believe that Paul was the shooter." We do not find this argument persuasive. Chong's assertion that the interviews must have supported a theory that Paul was the shooter is pure speculation. Furthermore, even if the statements did not "considerably undermine[] probable cause to believe that Paul was the shooter," that fact is insufficient to establish that the statements were exculpatory with respect to Chong.

¶28 Chong further argues the mere fact that the police destroyed the recordings of the December 2013 interviews indicates that those recordings contained exculpatory evidence. Again, we are not persuaded. Multiple police officers testified that the recordings were destroyed in order to protect the identities of the witnesses who had expressed concerns about their safety. That testimony provided a plausible alternative motive for the destruction of the recordings. As such, the mere fact that the recordings were destroyed does not compel a conclusion that they contained exculpatory evidence.

¶29 For all of the foregoing reasons, we agree with the State that Chong has failed to show the December 2013 interviews of Watou, Mikey, and Ryan were exculpatory. In addition, we also conclude Chong has failed to show that those interviews were material to the determination of his guilt. Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. *Harris*, 272 Wis. 2d 80, ¶14. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case. *Id.* "[T]he mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense." *Id.*, ¶16 (citation omitted).

¶30    We conclude for three reasons that the December 2013 interviews of Watou, Mikey, and Ryan do not meet the test for materiality.  First, as discussed above, those interviews did not exculpate Chong.  Thus, it is not reasonably probable that the result of Chong's trial would have been different had the interviews been disclosed to the defense.

¶31    Second, when assessing whether suppressed evidence was material, a reviewing court may consider the effect that suppression might have had on the preparation or presentation of the defendant's case.  *Harris*, 272 Wis. 2d 80, ¶14.  Here, there is no evidence that the State's suppression of the December 2013 interviews altered Chong's trial strategy.  Although the police deleted the recordings of those interviews, they reinterviewed Watou, Mikey, and Ryan in April 2015.  Chong's trial attorneys had obtained copies of the April 2015 interviews by May 26, 2015—approximately nine months before the start of Chong's trial.  In addition, Chong alleged in a pretrial filing that a defense investigator had interviewed Ryan, and during that interview Ryan gave a description that excluded Chong as the shooter.

¶32    Thus, by the time of trial, Chong knew what testimony Watou, Mikey, and Ryan would potentially provide at trial.  He could have called those witnesses to testify if he believed their testimony would exculpate him, even though the police had deleted the recordings of their December 2013 interviews.  If any of the three men had identified Chong as the shooter at trial, Chong could have impeached that testimony with their prior inconsistent statements from April 2015.  *See* WIS. STAT. § 908.01(4)(a)1. (2017-18).[7]  Although Chong did not

---

[7] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

call Watou, Mikey, or Ryan to testify at trial, he does not argue that decision was caused by the deletion of their December 2013 interviews.

¶33 Third, the State introduced strong evidence of Chong's guilt at trial. Specifically, the State introduced evidence that seven individuals had heard Chong confess his involvement in the shooting:

- Via Thao testified that Chong admitted he had "pulled out a gun" and shot "[a] guy" during a fight in downtown Appleton.

- Peter Moua testified that he and Chong had discussed the shooting at the Luna Lounge, and Chong stated, "[I] got him."

- Kong Vang testified Chong stated he had "shot somebody" to "protect his brother."

- Stephanie Thao testified that while she and her sister, Melanie Thao, were eating at a sushi restaurant with Chong on December 9, 2013, he mentioned a shooting at the Luna Lounge and said "he was the one who did it." According to Stephanie, Chong told her "that the other guy was gonna swing at his brother and that's when [Chong] got mad" and shot him in the head.

- Melanie Thao testified that she did not hear Chong say anything about the shooting during the sushi dinner on December 9, 2013. However, she then conceded she had previously told detectives that during that dinner, Chong stated he saw the victim "like he was about to swing at [Chong's] brother or something" and Chong then "shot the guy."

- Thor testified that Chong said he "did the shooting at Luna Lounge."

- A police detective testified Phong had stated during an interview that he went to Thor's house after the shooting and "about maybe half an hour to an hour [later] Chong Lee came to the residence and told them that he popped a guy."

In addition, an officer testified at trial that Paul had told law enforcement Chong "was the shooter."

¶34 Strong evidence against a defendant can render suppressed evidence immaterial under **Brady**. *See Wayerski*, 385 Wis. 2d 344, ¶62. Here, given the strong evidence of Chong's guilt outlined above, it is not reasonably probable the jury would have acquitted Chong of the homicide charge absent the State's suppression of the December 2013 interviews.

¶35 Chong questions the strength of the evidence against him, citing *State v. Bannister*, 2007 WI 86, ¶23, 302 Wis. 2d 158, 734 N.W.2d 892, for the proposition that a criminal conviction "will not stand on the basis of a defendant's confession alone." He asserts the State has not cited any evidence corroborating his alleged confessions to the seven individuals listed above.

¶36 This argument fails because the "corroboration rule" discussed in *Bannister* merely requires the State to produce evidence corroborating "any significant fact" of the confession. *Id.*, ¶26. In *Bannister*, our supreme court explained that a significant fact

> is one that gives confidence that the crime the defendant confessed to actually occur[red]. A significant fact need not either independently establish the specific elements of the crime or independently link the defendant to the crime. Rather, the State must present at least one significant fact

14

that gives confidence that the crime the defendant has been convicted of actually did occur.

*Id.*, ¶31.

¶37 For instance, in ***State v. DeHart***, 242 Wis. 562, 566, 8 N.W.2d 360 (1943), DeHart confessed to being a party to a murder and robbery. He told authorities that he was not inside the victim's residence when the shooting occurred, but he stayed outside to keep watch. ***Id.*** On appeal, the court stated that "evidence as to the location and condition of the [victim's] body, and expert testimony that the condition of the bones was consistent with buckshot wounds inflicted at close range, sufficiently corroborated [DeHart's] confession." ***Id.*** As our supreme court observed in ***Bannister***, "None of the corroborating evidence specifically related to DeHart's role in the crime. Rather, the corroborating evidence permits confidence in that the fact that the crime DeHart confessed to indeed occurred." ***Bannister***, 302 Wis. 2d 158, ¶30.

¶38 Here, the State introduced evidence at trial showing that the crime Chong confessed to actually occurred. Specifically, a medical examiner testified that he had performed an autopsy of the victim's body and determined the cause of death was a gunshot wound to the head. Police also recovered a spent casing from the Luna Lounge. In addition, there was evidence connecting Chong to the crime—specifically, video footage that showed him exiting the Luna Lounge shortly after the shooting. All of this evidence corroborated Chong's multiple confessions to being the shooter. Moreover, it appears that each independent confession by Chong provided additional corroboration for his other confessions. *See* ***State v. Hauk***, 2002 WI App 226, ¶¶21-26, 257 Wis. 2d 579, 652 N.W.2d 393.

¶39    Ultimately, the December 2013 interviews with Watou, Mikey, and Ryan were neither favorable to Chong nor material to the jury's determination of his guilt.  Chong has therefore failed to establish that the State violated his right to due process by failing to disclose the December 2013 interviews.

## II.  Destruction of the December 2013 interview recordings

¶40    Chong next argues that the State violated his right to due process by intentionally destroying the recordings of the December 2013 interviews.  Under *Arizona v. Youngblood*, 488 U.S. 51 (1988), "a defendant's due process rights regarding the destruction of evidence are violated if the State (1) fails to preserve evidence that is apparently exculpatory or (2) acts in bad faith by failing to preserve evidence that is potentially exculpatory."  *State v. Luedtke*, 2015 WI 42, ¶53, 362 Wis. 2d 1, 863 N.W.2d 592.[8]  When reviewing whether the destruction of evidence violated a defendant's right to due process, we accept the circuit court's findings of fact unless they are clearly erroneous, but we independently review whether the facts gave rise to a due process violation.  *Id.*, ¶37.

¶41    In this case, we agree with the State that Chong is not entitled to relief under the first prong of the *Youngblood* analysis because the December 2013 interviews were not apparently exculpatory.  Evidence is apparently exculpatory when:  (1) it possesses an exculpatory value that was apparent to those

---

[8] The State argues that the "due process test" set forth in *State v. Luedtke*, 2015 WI 42, ¶53, 362 Wis. 2d 1, 863 N.W.2d 592, is "based on a misinterpretation of the relevant [United States] Supreme Court precedent," including *Arizona v. Youngblood*, 488 U.S. 51 (1988).  However, as the State tacitly acknowledges, we are bound by the Wisconsin Supreme Court's decision in *Luedtke*.  *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) ("The supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case.").

who had custody of the evidence before it was destroyed; and (2) the evidence is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *State v. Munford*, 2010 WI App 168, ¶21, 330 Wis. 2d 575, 794 N.W.2d 264.

¶42    Chong has not made either of these showings.  First, as explained above, the December 2013 interviews were not exculpatory.  Thus, their exculpatory value would not have been apparent to the police officers who had custody of the interview recordings.

¶43    Second, Chong could have obtained comparable evidence by other reasonably available means.  Chong had access to the April 2015 interviews of Watou, Mikey, and Ryan, and a defense investigator had interviewed Ryan prior to trial.  Chong could have called those witnesses to testify at trial if he believed their testimony would exculpate him, and if they testified inconsistently with their April 2015 interviews, he could have introduced those interviews as prior inconsistent statements under WIS. STAT. § 908.01(4)(a)1.  Accordingly, Chong "was not without alternative means to demonstrate [his] innocence," and he therefore "retained the right to raise the same issues and create the same doubt that could have been raised and created by use of the destroyed evidence." *See State v. Pankow*, 144 Wis. 2d 23, 44, 422 N.W.2d 913 (Ct. App. 1988).

¶44    As for the second prong of the *Youngblood* analysis, the circuit court concluded the December 2013 interviews were potentially exculpatory, and it further found that the police had acted in bad faith by destroying the interview recordings.  On appeal, the State does not dispute that the interviews were potentially exculpatory.  We therefore deem that point conceded.  *See Charolais*

17

*Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

¶45 In order to prove that potentially exculpatory evidence was destroyed in bad faith, a defendant must show that the officers who destroyed the evidence: (1) were aware of its potentially exculpatory value or usefulness; and (2) acted with official animus or made a conscious effort to suppress exculpatory evidence. *Luedtke*, 362 Wis. 2d 1, ¶46. Here, the circuit court's finding that the officers acted in bad faith by destroying the interview recordings is not clearly erroneous. The officers interviewed Watou, Mikey, and Ryan early in their investigation, but they did not disclose that fact to the defense. They nevertheless retained the interview recordings for seven or eight months. An officer conceded that the police eventually destroyed the recordings because they knew the defense would be able to obtain them through discovery. These facts support a finding that the officers acted in bad faith by destroying the recordings. As the circuit court noted, the decision to destroy the recordings was "made with some forethought" and was "an unusual practice" that was "inconsistent with the spirit of [the police department's] interview retention policies."[9]

¶46 Although the circuit court determined that the police violated Chong's right to due process by destroying potentially exculpatory evidence in bad faith, the court nevertheless concluded that dismissal of the homicide charge was not the appropriate remedy for that violation "in light of the facts and

---

[9] The State cites other evidence that arguably suggests the officers did not act in bad faith. However, a factual finding is not clearly erroneous merely because there is evidence in the record that would support a contrary finding. *See Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249, 274 N.W.2d 647 (1979).

circumstances associated with this case." Instead, the court granted an alternative form of relief—namely, it prohibited the State (but not Chong) from calling Watou, Mikey, or Ryan to testify at trial. Chong now argues the court erred by failing to dismiss the homicide charge.

¶47 When the government has destroyed evidence in a criminal case in violation of a defendant's right to due process, determining the proper remedy for that violation is within the circuit court's discretion.[10] *State v. Huggett*, 2010 WI App 69, ¶25, 324 Wis. 2d 786, 783 N.W.2d 675. When we review a circuit court's discretionary decision, the question is not whether we believe the court's decision was "right" or "wrong." *State v. Jeske*, 197 Wis. 2d 905, 913, 541 N.W.2d 225 (Ct. App. 1995). Rather, we will uphold the court's exercise of discretion "unless it can be said that no reasonable judge, acting on the same facts and underlying law, could reach the same conclusion." *Id.* Moreover, when a circuit court fails to set forth its reasoning in support of a discretionary decision, we independently review the record to determine whether it provides a basis for the court's exercise of discretion. *See State v. Pharr*, 115 Wis. 2d 334, 343, 340 N.W.2d 498 (1983).

¶48 When determining whether dismissal is warranted as a sanction for the State's destruction of evidence, a court should consider: (1) the degree of negligence or bad faith by the government; (2) the importance of the evidence lost; and (3) the other evidence of the defendant's guilt adduced at trial. *State v.*

---

[10] Chong asserts that a "number of courts" in other jurisdictions "have concluded that dismissal is the only remedy for a *Youngblood* violation." However, Chong cites no Wisconsin authority in support of that proposition. To the contrary, Wisconsin cases state that a court has discretion to determine the appropriate remedy for a *Youngblood* violation. *See, e.g.*, *State v. Huggett*, 2010 WI App 69, ¶25, 324 Wis. 2d 786, 783 N.W.2d 675.

*Amundson*, 69 Wis. 2d 554, 579-80, 230 N.W.2d 775 (1975), *overruled on other grounds by Wayerski*, 385 Wis. 2d 344.[11] In the instant case, each of these factors supports the circuit court's discretionary decision that suppression, rather than dismissal, was the appropriate remedy for the due process violation.

¶49 First, the degree of negligence or bad faith weighs against dismissal. Although the circuit court found that the police acted in bad faith by destroying the December 2013 interview recordings, it cited certain mitigating factors suggesting that it did not believe a high degree of bad faith was present. For instance, the court conceded that the destruction of the recordings was motivated, at least in part, by the officers' desire to protect the witnesses' identities. The court also stated it did not believe that the police "engaged in intentional destruction of evidence in an effort to usurp [Chong's] right to a fair trial." In addition, while the court concluded the officers had violated the "spirit" of the police department's interview retention policies, it acknowledged that the destruction was "perhaps not in violation of a direct policy."

¶50 The second *Amundson* factor—the importance of the lost evidence—also weighs against dismissal. As discussed at length above, Chong has not shown that the December 2013 interviews of Watou, Mikey, and Ryan were either exculpatory or material to the jury's determination of his guilt. Moreover, the police reinterviewed those witnesses in April 2015, and recordings of those interviews were provided to the defense. In addition, a defense

---

[11] In *State v. Wayerski*, 2019 WI 11, 385 Wis. 2d 344, 922 N.W.2d 468, our supreme court overruled the holding in *State v. Amundson*, 69 Wis. 2d 554, 230 N.W.2d 775 (1975), and other cases that evidence is suppressed by the State for purposes of *Brady v. Maryland*, 373 U.S. 83 (1963), only if that evidence was in the State's exclusive possession and control. *See Wayerski*, 385 Wis. 2d 344, ¶¶49-50; *Amundson*, 69 Wis. 2d at 573.

investigator had interviewed at least one of the men before trial, and Chong could have called all three of them to testify. Under these circumstances, we cannot conclude that the recordings of the December 2013 interviews were particularly important to Chong's defense.

¶51 Finally, the third *Amundson* factor—the other evidence of the defendant's guilt adduced at trial—further supports the circuit court's decision not to dismiss the homicide charge. As discussed above, the State presented strong evidence of Chong's guilt on the homicide count. Specifically, there was evidence that Chong had confessed his involvement in the shooting to seven different individuals prior to trial.

¶52 Chong nevertheless argues that suppression was inappropriate under the circumstances because it had a "detrimental effect on [his] case."[12] He contends, "In this circumstantial case, without any other witnesses identifying the shooter, the testimony of [Watou, Mikey, and Ryan] would have established reasonable doubt as to whether Chong was the shooter." This argument fails because the circuit court's suppression ruling merely prevented the State from calling Watou, Mikey, or Ryan to testify at trial. The court did not prevent Chong from calling those witnesses if he believed their testimony would have aided his defense. Moreover, when the court announced its decision to impose suppression as a remedy for the State's due process violation, Chong did not object on the

---

[12] Although Chong's motion to dismiss the homicide charge sought suppression as an alternative remedy for the officers' destruction of the December 2013 interviews, the alternative remedy Chong sought was not precisely the same as the remedy the circuit court ultimately granted. Chong's motion asked the court to suppress "any in court identification of Chong" by Watou, Mikey, and Ryan and any testimony by those witnesses "that links Chong … to the homicide in this case." The court instead ruled that the State could not call Watou, Mikey, or Ryan to testify at trial.

21

basis that suppression would be detrimental to him. A specific, contemporaneous objection is required to preserve a claim of error for appeal. *State v. Delgado*, 2002 WI App 38, ¶12, 250 Wis. 2d 689, 641 N.W.2d 490.

¶53    In summary, we agree with the circuit court that the police violated Chong's right to due process by destroying the recordings of the December 2013 interviews. However, we conclude the court properly exercised its discretion by denying Chong's motion to dismiss the homicide charge in favor of the alternative remedy of suppression.

## III.  Absence of transcripts

¶54    In the alternative, Chong argues that he is entitled to a new trial due to the absence of transcripts of: (1) any in-chambers discussions regarding the admissibility of the phrase "beat this case" in the letter read by Stephanie Thao during her trial testimony; and (2) the parties' discussion with the circuit court regarding the jury's request to view that letter during deliberations. "[A] missing transcript that cannot be re-created entitles the defendant to a new trial if the defendant demonstrates a 'colorable need' for the transcript."[13] *State v. Parker*, 2002 WI App 159, ¶9, 256 Wis. 2d 154, 647 N.W.2d 430 (citation omitted). To demonstrate a colorable need for a missing transcript, the defendant must prove that the transcript, if available, would show a "facially valid claim of error"—that is, an error that "might lend color to a claim of prejudicial error." *State v. Perry*, 136 Wis. 2d 92, 101, 401 N.W.2d 748 (1987) (citation omitted). The

---

[13] In this case, it is undisputed that the transcripts in question cannot be re-created.

determination of whether a missing transcript entitles the defendant to a new trial is committed to the circuit court's discretion. *Id.* at 108-09.

¶55 Chong argues he has a "colorable need" for the missing transcripts at issue here because, without them, he "cannot assert a claim relative to the improper admission of the 'beat this case' evidence." Specifically, he argues that because he does not know whether his trial attorneys objected to the admission of that evidence in chambers or argued against allowing the jury to view the "beat this case" letter, he is "unable to identify or assert where his claim of error lies: whether his claim is that counsel was ineffective in failing to object or whether the circuit court erroneously admitted this evidence over counsel's objection."

¶56 As acknowledged above, a specific, contemporaneous objection is required to preserve a claim of error for appeal. *Delgado*, 250 Wis. 2d 689, ¶12. Moreover, "[t]he party alleging error has the burden of establishing, by reference to the record, that the error was raised before the [circuit] court." *Young v. Young*, 124 Wis. 2d 306, 316, 369 N.W.2d 178 (Ct. App. 1985). In criminal cases, forfeited issues are typically addressed "within the rubric of the ineffective assistance of counsel." *State v. Erickson*, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999). However, "[w]here … a portion of the record is lost through no fault of the aggrieved party, that party should not be made to bear the burden of this loss." *State v. DeLeon*, 127 Wis. 2d 74, 77, 377 N.W.2d 635 (Ct. App. 1985). Thus, Chong could have directly challenged the circuit court's rulings regarding the admissibility of the "beat this case" letter and its provision to the jury, even though the missing transcripts mean that Chong cannot prove his attorneys preserved those issues for appeal.

23

¶57    In any event, Chong could have directly challenged the circuit court's rulings regarding the "beat this case" letter on appeal and then argued, in the alternative, that if his trial attorneys did not adequately preserve those issues for review, they were ineffective by failing to do so. Defendants routinely make this type of alternative argument. *See, e.g.*, ***State v. Cummings***, 199 Wis. 2d 721, 747 n.10, 546 N.W.2d 406 (1996); ***State v. Brown***, 2003 WI App 34, ¶22 n.9, 260 Wis. 2d 125, 659 N.W.2d 110. We therefore reject Chong's claim that without the missing transcripts he was unable to determine whether he should directly challenge the court's rulings or instead raise his arguments under the ineffective assistance framework, and he therefore had a colorable need for the transcripts.

¶58    Chong also appears to argue that without the missing transcripts, he cannot know why the circuit court permitted Stephanie to read the "beat this case" letter at trial after previously concluding that phrase was inadmissible, or why the court allowed the jury to view the letter during its deliberations. Chong suggests this lack of knowledge somehow prevents him from meaningfully challenging the court's rulings on appeal.

¶59    We do not find this argument persuasive. The circuit court's rulings regarding the admissibility of the "beat this case" letter and whether to send that letter to the jury were discretionary decisions. *See* ***State v. Ringer***, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448 (admission of evidence); ***State v. Hines***, 173 Wis. 2d 850, 858, 496 N.W.2d 720 (Ct. App. 1993) (sending an exhibit to the jury). Where a circuit court sets forth no reasons or inadequate reasons for a discretionary decision, we independently review the record to determine whether the court properly exercised its discretion and whether the facts support its decision. ***Miller v. Hanover Ins. Co.***, 2010 WI 75, ¶30, 326 Wis. 2d 640, 785 N.W.2d 493.

¶60    Thus, had Chong argued on appeal that the circuit court erroneously exercised its discretion by admitting the "beat this case" letter or by sending that letter to the jury, we would have independently reviewed the record to determine whether it supported the court's discretionary decisions, even without any documentation of the court's reasoning on those issues.  As a result, the fact that there is no record of the court's reasoning does not demonstrate the existence of a colorable need for the missing transcripts.  Because Chong has not shown that such a colorable need exists, the court did not erroneously exercise its discretion by denying his request for a new trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.